**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | |
|---|---|
| LUCYNA CASTILLO, | |
| Plaintiff, | |
| v. | CAUSE NO.: 2:19-CV-166-TLS |
| FRANCISCAN ALLIANCE, INC., | |
| Defendant. | |

**OPINION AND ORDER**

This matter is before the Court on the Defendant's Motion for Summary Judgment [ECF No. 27] and the Defendant's Motion to Strike [ECF No. 35], both of which are fully briefed and ripe for ruling. For the reasons set forth below, the Court denies as moot the motion to strike and grants the motion for summary judgment.

**PROCEDURAL BACKGROUND**

The Plaintiff Lucyna Castillo filed a Complaint [ECF No. 1] against the Defendant Franciscan Alliance, Inc., bringing claims of race discrimination under Title VII of the Civil Rights Act of 1964 (Count I); associational disability discrimination under the Americans with Disabilities Act (ADA) (Count II); interference with her rights under the Family Medical Leave Act (FMLA) (Count III); retaliation under the FMLA (Count IV); and wrongful termination under Indiana state law (Count V). The Defendant now seeks summary judgment in its favor on all claims. In response, the Plaintiff has withdrawn her race discrimination and wrongful termination claims; therefore, the Court grants summary judgment in favor of the Defendant on those claims. The remaining claims in Counts II through IV will be considered on the instant motion for summary judgment.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant may discharge this burden by "either: (1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citation omitted). In response, the non-movant "must make a sufficient showing on every element of [her] case on which [she] bears the burden of proof; if [she] fails to do so, there is no issue for trial." *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

In ruling on a motion for summary judgment, a court must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Id.* (citation omitted). A court's role "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted). Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## MOTION TO STRIKE

With its summary judgment reply brief, the Defendant filed a Motion to Strike [ECF No. 35]. The Plaintiff filed a response [ECF No. 37], but the Defendant did not file a reply. For the following reasons, the Court denies the motion as moot. First, the Defendant asks the Court to strike ten of the Plaintiff's exhibits submitted in support of her summary judgment response

brief, *see* Pl. Exs. 1–5, 7, 10, 11, 13, and 14, on the basis that they are unauthenticated.[1] Federal Rule of Civil Procedure 56(c)(2) provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). However, the Defendant does not argue why the exhibits could not be rendered admissible through testimony, or otherwise, at trial. *See Waldridge*, 24 F.3d at 921, 921 n.2 ("[T]he evidence set forth must be of a *kind* admissible at trial."). Regardless, any objection to the admissibility of these exhibits is moot because, even considering these records, the Plaintiff has not created a genuine dispute of material fact for trial on her remaining claims.

Second, pursuant to Rule 56(e), the Defendant asks the Court to strike thirty-one factual statements from the Plaintiff's brief as unsupported by the evidence. In reviewing the parties' submissions on summary judgment, the Court carefully reviews the briefs and considers only those facts supported by a citation to evidence in the record. Any factual statement made in either party's brief not supported by the evidence is not considered by the Court.

## MATERIAL FACTS

### A.    The Plaintiff's Employment with the Defendant

At the time the Plaintiff was hired in October 2015, her supervisor was Kathy Thacker. Def. Ex. 2, ¶ 8. On December 11, 2017, Vice President of Administrative Services Sister Aline Schultz distributed by email a copy of a patient testimonial posted on Facebook that praised many staff members, including the Plaintiff whose care the patient described as "exceptional." Pl. Ex. 4; Def. Ex. A. Later in December, Thacker filed two Corrective Action Reports regarding the Plaintiff—one for unacceptable job performance and one for improper conduct. Def. Ex. 2, ¶¶ 9–11. In January 2018, Rachel Moody became the Plaintiff's supervisor. *Id.* at ¶ 12; Def. Ex.

---

[1] The Defendant's exhibits are attached to Docket Entries 27 and 36, and the Plaintiff's exhibits are attached at Docket Entry 32.

1, ¶ 5. Following a review with the Plaintiff of the December 2017 incidents, Moody reduced both incidents to verbal counseling. Pl. Exs. 1, 2.

Within the first few weeks after becoming the Plaintiff's supervisor, Moody met with the Plaintiff to discuss significant concerns that were being reported regarding the Plaintiff's job performance, including delays in transferring patients; delays in discharging patients; inappropriate language and communication with patients, family members, and coworkers; refusing to start an IV; disagreeing with coworkers and the nurse supervisor regarding a request that the Plaintiff float to another unit; and failure to report for call within the time period required. Def. Ex. 1, ¶ 7. Moody concluded that, rather than focus on the Plaintiff's own shortcomings, the Plaintiff focused on everyone else's performance and what she thought they were doing wrong. *Id.* at ¶ 8. Moody found that the Plaintiff was difficult, tried to justify her behavior based on the lack of a policy that specifically prohibited her unacceptable behavior, threatened coworkers with punishment if they did not do what she asked, and created a hostile work environment for her coworkers who felt they had to "walk on eggshells" around the Plaintiff and would visibly shake at the thought of having to work with her. *Id.* at ¶ 9. Regarding a March 7, 2018 conversation with Moody, the Plaintiff testified that she did not remember Moody sharing with her the perception that the Plaintiff was creating a hostile work environment. Pl. Ex. 6, 138:20–139:11. The Plaintiff testified that she did not know why a specific nurse would physically shake when dealing with the Plaintiff or why another nurse reported that she was "walking on eggshells" around the Plaintiff. *Id*. at 163:19–164:10.

The Plaintiff, in turn, reported numerous concerns to Moody about her coworkers. Def. Ex. 1, ¶ 12. This included the Plaintiff feeling that she was targeted by being discredited and improperly made to "float" between hospital campuses; feeling that the culture was unprofessional; concerns about healthcare core principles and infection control; complaints that

the float procedure was unfair; and complaints about nurses shopping online, holding pizza parties, and not working as hard as they should. *Id.*; Pl. Ex. 5. Moody investigated each concern raised by the Plaintiff, interviewed other employees involved, made written summaries of those discussions, and responded to the Plaintiff either verbally or in writing. Def. Ex. 1, ¶¶ 15–16. Moody found no evidence the Plaintiff was being unfairly targeted or otherwise mistreated by her coworkers. *Id.* at ¶ 17. The Plaintiff testified that she and Moody had a good relationship and Moody was receptive to her concerns. Def. Ex. 5, 131:14–132:3. The Plaintiff did not complain to Moody of being mistreated because of her daughter's disability, her requests to take FMLA leave, or taking FMLA leave. Def. Ex. 1, ¶ 13.

**B.      The Events of March 18, 2018, and the Termination of the Plaintiff's Employment**

On March 18, 2018, the Plaintiff was scheduled to work a shift in the Intermediate Care Unit (IMCU) beginning at 7 a.m. Def. Ex. 1, ¶ 19. The Plaintiff was told that she was in charge of the shift. Pl. Ex. 6, 147:12–15; Pl. Ex. 8. When she arrived, the Plaintiff was assigned five patients and the other RN working with her that day, Gilda Navarro, who was floating to the IMCU from the Medical Surgical Department, was assigned four patients. Def. Ex. 4, ¶ 7. The Plaintiff was concerned that the patients' safety and her nursing license were at risk because she believed Navarro was not fully trained in the IMCU department, which the Plaintiff believed made all nine patients her responsibility. Pl. Ex. 6, 121:24–122:10, 124:1–15, 148:19–149:3, 152:1–153:2, 154:7–22. The Plaintiff raised concerns about the assignment of patients with Nursing Supervisor Lydia Espinosa, who found the assignments acceptable and told the Plaintiff the assignments were final. Def. Ex. 4, ¶ 8.

The Plaintiff raised the issue with the charge nurse and another individual and was told she could reach out to her manager, Moody, if she still had concerns. *Id.* at ¶ 9; Pl. Ex. 8. At 7:37 a.m., the Plaintiff called and told Moody that she would not take five patients in the IMCU

because it was unsafe to have nine patients with only two RNs. Def. Ex. 1, ¶ 20. Moody explained that the staffing ratios were guidelines and that the current situation was acceptable. *Id.* at ¶ 22. The Plaintiff also complained that she thought Navarro was incompetent. *Id.* at ¶ 25. Franciscan had determined that Navarro was a fully competent RN and could provide patient care as an RN in the IMCU. *Id.* at ¶ 26. Moody explained to the Plaintiff that she was not being asked to do anything that could jeopardize her nursing license and that she needed to accept the patients and care for them. *Id.* at ¶ 27. Moody reminded the Plaintiff that it is patient abandonment for her not to care for her assigned patients. *Id.* at ¶ 28. Espinosa, who is an RN, spent several hours on the unit assisting the Plaintiff and Navarro, but issues with the Plaintiff's demeanor and conduct continued. Def. Ex. 4, ¶¶ 11, 12.

Based on her investigation, Moody concluded that the Plaintiff "did not take report on her patients" until 8:00 a.m., which lasted until 8:40 a.m., and that another nurse was required to pass out medications at 8:00 a.m. for the Plaintiff. Def. Ex. 1, ¶ 29. During the day, Espinosa had two of the nine patients transferred out of the IMCU. Def. Ex. 4, ¶ 14. Espinosa stated that the Plaintiff nevertheless continued to refuse patient admissions, requiring Espinosa to assign the patients to Navarro. *Id.* at ¶ 15. Espinosa explained that the IMCU could admit one patient over the staffing plan without issue. *Id.* at ¶ 16. According to Franciscan's staffing plan for the IMCU, three nurses would care for between nine and twelve patients and two nurses would care for between one and eight patients; staffing up or down from this guideline could occur. Def. Ex. 1, ¶ 32; Def. Ex. 1-C. Moody's investigation revealed that, when the Plaintiff refused to take report on a patient, Espinosa had to start the patient's IV and that the Plaintiff refused to make the night staffing assignments. Def. Ex. 1, ¶ 31; Def. Ex. 4, ¶ 17. The Plaintiff testified that she was not refusing patient care but rather that she was collaborating with the nursing supervisor in the best interests of the patient's safety and her nursing license. Pl. Ex. 6, 160:21–161:9; *see also* Pl. Ex.

6

8. She testified, "I delayed taking report until I spoke to my nurse superiors . . . to see if this was an acceptable situation, because that's not what the policy says." Pl. Ex. 6, 153:6–10.

On March 19, 2018, Moody called the Plaintiff and they discussed the events of the previous day. Pl. Ex. 9. Moody asked the Plaintiff four times if she had refused to admit or take five patients; the Plaintiff responded that she did not refuse to take the patients but that she was asking for assistance. *Id*. Moody told the Plaintiff that she was being suspended pending an investigation due to her alleged insubordination on March 18, 2018. *Id.*; Def. Ex. 1, ¶ 33. Moody conducted an investigation of the Plaintiff's March 18, 2018 conduct. Def. Ex. 1, ¶ 34. From her investigation, Moody concluded that the Plaintiff refused to accept five IMCU patients for over one hour, refused to make night staff assignments, forced others to pass medications for her, would not take report on a patient or start an IV, failed to perform bedside reports, failed to properly handoff patients to the following shift, and acted inappropriately with her coworkers. *Id.* at ¶ 36. This included a finding that the Plaintiff acted in a threatening and abusive manner toward her coworkers. *Id.* at ¶ 38. Moody concluded that the Plaintiff had violated several Franciscan policies. *Id.* at ¶ 37.

On March 20, 2018, Moody received an email from the Plaintiff with a complaint that, on March 17, 2018, the Intensive Care Unit (ICU) had delayed transferring a patient from the IMCU to the ICU for almost four hours, identifying the ICU nurse involved as Rhea Grosskurth. *Id.* at ¶¶ 40, 41; Pl. Ex. 13. The Plaintiff believed that the delay placed the patient in jeopardy. Pl. Ex. 6, 120:1–121:4. Moody investigated the incident and determined that, at time of the incident, the Plaintiff was seeking to transfer a patient from the IMCU to the ICU; Grosskurth told the Plaintiff that the ICU could not take the patient; at the time of the incident, the ICU was full and did not have room for the patient the Plaintiff was seeking to transfer; a patient from the ICU

first needed to be transferred to the IMCU to open an ICU bed for the patient; Grosskurth did not

refuse care to a patient; and no further action was warranted. Def. Ex. 1, ¶¶ 42, 43.

On March 21, 2018, Moody recommended to Vice President Sister Aline Schultz and

Vice President of Patient Services/Chief Nursing Officer Alisa Murchek that the Plaintiff's

employment be terminated for "insubordination" and "for conduct that jeopardizes patient

safety." *Id.* at ¶ 39; *id.* Ex. E (Corrective Action Report); Def. Ex. 3, ¶¶ 3, 5; *see also* Def. Exs.

A, C. On March 22, 2018, Sister Aline and Murchek agreed with the recommendation and

approved the termination. Def. Ex. 2, ¶ 23; Def. Ex. 3, ¶ 6; *see also* Def. Exs. A, C.

On March 22, 2018, Moody attempted to call the Plaintiff eight times to communicate the

decision to terminate her employment; the Plaintiff did not answer her telephone and her

voicemail was full. Def. Ex. 1, ¶ 45. Moody also emailed the Plaintiff the same day to notify her

that Moody had attempted to reach her by telephone and needed to speak with her as soon as

possible. *Id.* at ¶ 46. On March 23, 2018, Castillo sent an email response at 1:40 a.m., informing

Moody that she was taking care of her mother who had fallen and broken her hip and asking if

they could schedule a time to talk. Pl. Ex. 10; Pl. Ex. 6, 170:6–171:8. At 4:39 a.m., Moody

forwarded the email to Murchek. Pl. Ex. 10. Moody was out of the office for a week beginning

on March 23, 2018. *See* Def. Ex. 2-E, at 1.

On March 28, 2018, Murchek called the Plaintiff five times to communicate the decision

to terminate her employment, but never received an answer. Def. Ex. 3, ¶ 7. On March 30, 2018,

having received no response from the Plaintiff and concluding that the Plaintiff had abandoned

her role, Franciscan terminated her employment. *Id.* at ¶ 8; *see also* Pl. Ex. 14. On the Employee

Status Change form, dated March 30, 2018, under the heading "Reason for Change," is

handwritten: "Termination, Job Abandonment." Pl. Ex. 14. Under the heading "Termination,"

the choice "resigned" is checked from the choices "resigned," "discharged," "retired,"
"disability," and "other." *Id.*

## C.    The Plaintiff's FMLA Leave

The Plaintiff took FMLA leave several times during her employment. Def. Ex. 2, ¶ 13.
On June 16, 2017, the Plaintiff applied and was approved for intermittent FMLA leave from June
22, 2017, through June 21, 2018, to care for her daughter. *Id.* at ¶¶ 14, 15; Pl. Ex. 11. On
February 5, 2018, the Plaintiff was informed that recertification documentation was needed
because the Plaintiff had requested leave that exceeded the duration noted on the certification
form. Def. Ex. 2, ¶ 16. A recertification form was not received from the Plaintiff. *Id.* at ¶ 17. On
March 13, 2018, the Plaintiff submitted a new FMLA certification form. *Id.* at ¶ 18. On the
portion of the form completed by the health care provider, it noted a frequency of four times per
month, but failed to include any duration other than "varied." *Id.* at ¶ 20.

On March 14, 2018, David J. Fowlie, Leave Specialist for Sedgwick, the Defendant's
third-party FMLA administrator, sent an email to the Defendant's "Leave of Absence" email
account and Amy Hernandez, an employee of the Defendant, stating that the Plaintiff "has
applied for family/medical leave beginning on 03/13/2018 for Family Medical." Pl. Ex. 7; *see*
Def. Ex. 2, ¶ 21. The subject of the email was "Castillo/908160 – Notice of Intermittent Leave to
Supervisor," and the body of the email contained the same information in bold. Pl. Ex. 7. The
email indicated that the Plaintiff's application for family leave was pending and that notification
would be provided following a final determination. *Id.*

Sedgwick subsequently asked the Plaintiff for clarification as to the requested frequency
and duration of the leave, but the Plaintiff did not provide the information prior to the
termination of her employment on March 30, 2018, which ended the FMLA leave process. Def.
Ex. 2, ¶ 21. The doctor had signed the form with the additional information and clarification on

9

March 28, 2018. Def. Ex. 2-D (CASTILLO000105–108). On April 23, 2018, Sedgwick sent the

Plaintiff a letter informing her that it had not received the requested documents within the

required time frame. *Id*. (CASTILLO000140).

The Plaintiff thought the Defendant interfered with her ability to take FMLA leave by

treating her differently. Pl. Ex. 6, 183:22–25. She had hoped to talk to Moody about Moody's

investigation and to discuss FMLA issues, but they never had the discussion. *Id*. 183:12–21.

At the time of her recommendation to terminate the Plaintiff's employment, Moody was

unaware that the Plaintiff had ever applied for or taken FMLA leave. Def. Ex. 1, ¶ 14; *see also*

Def. Ex. D, ¶ 5. At that time, she was also unaware that the Plaintiff's daughter had any medical

condition or disability. Def. Ex. D, ¶ 6. At the time they approved Moody's recommendation to

terminate the Plaintiff's employment, neither Sister Aline nor Murchek was aware that the

Plaintiff had requested or taken medical leave, including but not limited to under the FMLA.

Def. Ex. A, ¶ 7; Def. Ex. C, ¶ 7. They were also not aware that the Plaintiff's daughter had any

medical condition or disability. Def. Ex. A, ¶ 8; Def. Ex. C, ¶ 8. Moody, Sister Aline, and

Murchek did not learn that the Plaintiff had requested or taken FMLA leave or that her daughter

had any medical condition or disability until May 2018 when they received a legal hold relating

to the Plaintiff's claims. Def. Ex. A, ¶ 9; Def. Ex. C, ¶ 9; Def. Ex. D, ¶ 7.

**ANALYSIS**

As detailed below, the Court grants the Defendant's motion for summary judgment on the

Plaintiff's claims of ADA associational disability discrimination and FMLA retaliation because

the Plaintiff has failed to show that any decisionmaker knew about the Plaintiff's protected

status. Summary judgment is also proper on the FMLA interference claim because the decision

to terminate the Plaintiff's employment had already been made when the Plaintiff engaged in the

conduct she contends put the Defendant on notice that she needed FMLA leave.

A.      **ADA Associational Disability Discrimination**

The Complaint alleges that the Defendant discriminated against the Plaintiff based on her association with an individual with a disability, namely her daughter. Title I of the ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . the . . . discharge of employees." 42 U.S.C. § 12112(a). The term "discriminate against a qualified individual on the basis of disability" includes "denying equal jobs or benefits to a qualified individual *because of* the *known* disability of an individual with whom the qualified individual is known to have a relationship or association." *Id.* § 12112(b)(4) (emphasis added).[2] This requires a showing of "but for" causation. *Castetter v. Dolgencorp, LLC*, 953 F.3d 994, 997 (7th Cir. 2020).

In seeking summary judgment on this claim, the Defendant argues that the Plaintiff cannot show the decisionmakers knew she had a daughter with a disability and, thus, cannot show her daughter's disability was a factor in the Defendant's decision to terminate her employment. The Plaintiff may survive summary judgment by showing that "the evidence [considered as a whole] would permit a reasonable factfinder to conclude" that the Defendant terminated her employment because of her association with her daughter who has a disability. *Id.* at 997 (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)).

First, the Defendant argues that the decisionmakers did not know that the Plaintiff's daughter had a disability. Moody, the Plaintiff's supervisor, made the decision on March 19,

---

[2] The Seventh Circuit has identified three "types of situations" that fall within the scope of § 12112(b)(4)'s protections: (1) "expense," where the associated person has a disability that is costly to the employer; (2) "disability by association," where the employer is concerned that the employee may become infected with or inherit a disease from the associated person; and (3) "distraction," where the employee is somewhat inattentive at work because the associated person requires the employee's attention, yet the employee is not so inattentive as to require an accommodation. *Larimer v. Int'l Bus. Machs. Corp.*, 370 F.3d 698, 700 (7th Cir. 2004).

2018, to suspend the Plaintiff and then made the recommendation on March 21, 2018, that the Plaintiff's employment be terminated. Moody avers that she did not know at the time of those decisions that the Plaintiff had applied for or taken FMLA leave to care for her daughter. In response, the Plaintiff offers no evidence to create a genuine dispute of fact as to Moody's knowledge of her daughter's disability. The Plaintiff cites only the March 14, 2018 email from David J. Fowlie, a Leave Specialist with Sedgwick, the Defendant's third-party FMLA administrator. The email has a subject line of "RE: Castillo/#098160 – Notice of Intermittent Leave Report to Supervisor" and contains the same phrase in bold in the body of the email. As shown on its face, Fowlie's email was sent to a general email address and to an employee named Amy Hernandez at her email address; there is no indication on the face of the email that it was sent to Moody. In her supplemental affidavit, Moody avers that she did not know that the Plaintiff's daughter had any medical condition or disability when she made the March 19 and 21, 2018 decisions. Likewise, Vice Presidents Sister Aline and Murchek, who approved the recommendation to terminate the Plaintiff's employment on March 22, 2018, did not know that the Plaintiff's daughter had any medical condition or disability.

The Plaintiff has offered no evidence to dispute these sworn statements or from which an inference could be drawn that Moody, Sister Aline, or Murchek knew of the Plaintiff's daughter's disability or were aware of Fowlie's email at the time of their decisions. Therefore, the Plaintiff cannot show that the decision to terminate her employment was because of her relationship with her daughter who has a disability. On this basis, the Court grants summary judgment in favor of the Defendant on the Plaintiff's ADA discrimination claim.

Second, the Defendant argues that the uncontroverted evidence shows it terminated the Plaintiff's employment because of her insubordination and conduct that jeopardized patient safety. Twice in December 2017, the Plaintiff received verbal counseling for improper conduct

and unacceptable job performance, which Moody was aware of when she became the Plaintiff's

supervisor in January 2018. In the first weeks of supervising the Plaintiff, Moody became aware

of complaints about the Plaintiff's conduct, which she investigated. Then, Moody's investigation

into the events of March 18, 2018, concluded that the Plaintiff refused to care for five patients

for over an hour, forced others to pass medications for her, would not take report on a patient or

start an IV, failed to perform bedside reports, failed to properly handoff patients to the following

shift, refused to make night staff assignments, and acted inappropriately with her coworkers.

Moody found that the Plaintiff had violated several Franciscan policies. This conduct led Moody

to suspend the Plaintiff on March 19, 2018, pending the investigation. On March 21, 2018,

Moody recommended that the Plaintiff's employment be terminated. Vice Presidents Sister Aline

and Murchek approved the decision on March 22, 2018.

In response, the Plaintiff contends that the Defendant's purported reasons for her

termination are a pretext for discrimination based on her association with her daughter who has a

disability. *See Sandefur v. Dart*, 979 F.3d 1145, 1155 (7th Cir. 2020) (explaining that the issue of

"pretext" is relevant when considering the evidence as a whole under *Ortiz*). In assessing pretext,

a court does "not evaluate whether the stated reason 'was inaccurate or unfair, but whether the

employer honestly believed the reason it has offered to explain'" the adverse action. *Harden v.

Marion Cnty. Sheriff's Dep't*, 799 F.3d 857, 864 (7th Cir. 2015) (citation omitted); *see also

Castetter*, 953 F.3d at 997 ("The only concern in reviewing an employer's reasons for

termination is the honesty of the employer's beliefs." (quoting *Forrester v. Rauland-Borg Corp.*,

453 F.3d 416, 419 (7th Cir. 2006))). "A pretextual decision, then, 'involves more than just faulty

reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony

reason for some action.'" *Harden*, 799 F.3d at 864 (citation omitted). To meet the burden of

showing that the employer's stated reason was pretextual, a plaintiff "must identify such

weaknesses, implausibilities, inconsistencies, or contradictions" in the employer's stated reason "that a reasonable person could find [it] unworthy of credence." *Id.* at 865 (quoting *Harper v. C.R. England, Inc.*, 687 F.3d 297, 311 (7th Cir. 2012)).

As an initial matter, the Plaintiff's failure to create a genuine dispute of fact that any decisionmaker knew of her daughter's disability means that there can be no pretext for discrimination on the basis of her daughter's disability. In addition, despite making several pretext arguments, the Plaintiff has not offered any evidence from which a reasonable person could disbelieve the Defendant's reason for terminating her employment.

First, the Plaintiff disputes the characterization of her March 18, 2018 conduct, contending that she was not insubordinate and did not refuse patient care but rather that she was concerned about the quality of nursing care and patient safety given the number of patients assigned to the two nurses on the shift.[3] The factual differences between the Plaintiff's and Moody's perceptions of the events are set out in the Material Facts section above. However, it is not enough that the Plaintiff disagrees with Moody's perception of the situation or how Moody handled the investigation or her discipline. "A court is not a 'super personnel department that second-guesses employers' business judgments.'" *Riley v. Elkhart Cmty. Schs.*, 829 F.3d 886, 895 (7th Cir. 2016) (quoting *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1181 (7th Cir. 2002)).

To show that Moody's beliefs regarding the Plaintiff's conduct on March 18, 2018 were not credible, the Plaintiff "must provide evidence that [she] was fired for reasons other than those provided, the reasons had no grounding in fact, or were insufficient to warrant termination." *Castetter*, 953 F.3d at 997 (citing *Senske v. Sybase, Inc.*, 588 F.3d 501, 507 (7th Cir. 2009)). The

---

[3] In her response brief, the Plaintiff also contends that she was inattentive at work on March 18, 2018, because of her daughter's disability. However, even if this argument were supported by evidence of record, the Plaintiff still has not shown that any decisionmaker knew that her daughter had a disability such that her inattentiveness might have been associated with her daughter.

only evidence the Plaintiff offers is her own perception of the events of March 18, 2018, and the December 11, 2017 email from Sister Aline sharing the patient testimonial of the Plaintiff's exceptional care. Notably, the Plaintiff does not dispute that on March 18, 2018, she did not take report on patients or provide patient care for more than an hour after her shift started; rather, she disputes the perception of why those events occurred. The Plaintiff has offered no evidence to show that Moody did not honestly believe that the Plaintiff's conduct on March 18, 2018, constituted insubordination or jeopardized patient safety, or that these were not the reasons for the decision to terminate the Plaintiff's employment.

Next, the Plaintiff contends that the Defendant offered "contradictory statements" or "shifting reasons" for terminating the Plaintiff's employment. The Plaintiff argues that she was purportedly terminated for performance issues and insubordination, which was approved on March 22, 2018, but that the March 30, 2018 form instead shows that the reason for her termination was "job abandonment." In asserting that this demonstrates "shifting reasons" for her termination, the Plaintiff conflates two discrete steps in the termination process. First, Moody's March 21, 2018 recommendation to terminate the Plaintiff's employment, which was approved by Vice Presidents Sister Aline and Murchek on March 22, 2018, was based on insubordination and conduct that jeopardized patient safety. It was only when the Defendant was unable to reach the Plaintiff to inform her of this decision that the Defendant determined on March 30, 2018, that the Plaintiff had abandoned her employment. The Plaintiff also finds it curious that the form indicates that the Plaintiff "resigned." However, the form shows that "Termination, Job Abandonment" is written in at the top of the form under the heading "Reason for Change" and that "resigned" is selected from four check box options for the reason for "termination." This is consistent with the evidence of record that the Defendant was unable to reach the Plaintiff to

communicate that her employment had been terminated. There was only one decision to terminate the Plaintiff's employment, which was made on March 22, 2018.[4]

Finally, the Plaintiff asserts that a reasonable inference can be drawn that her daughter's disability was a determining factor in the Defendant's decision because Moody did not discipline Rhea Grosskurth for similar conduct. However, the Plaintiff has not offered evidence to show that the two situations were materially similar or that Moody's findings regarding the incident with Grosskurth were unfounded. Moreover, Moody had already suspended the Plaintiff on March 19, 2018, when the Plaintiff first brought the March 17, 2018 incident with Grosskurth to Moody's attention. Again, it is undisputed that Moody did now know of the Plaintiff's daughter's disability at the time of either decision.

For all these reasons, the Court grants summary judgment in favor of the Defendant on the Plaintiff's claim of ADA associational disability discrimination in Count II.

## B.    FMLA Retaliation

Count IV of the Complaint alleges that the Defendant retaliated against the Plaintiff for exercising her rights under the FMLA. Indeed, the FMLA prohibits an employer from retaliating against an employee for exercising her statutory rights. *See Freelain v. Village of Oak Park*, 888 F.3d 895, 900 (7th Cir. 2018) (citing 29 U.S.C. § 2615). To prove a retaliation claim, a plaintiff must establish that (1) she engaged in a statutorily protected activity, (2) the employer took an adverse action against her, and (3) there is a causal connection between the two. *Id.* at 901 (citing

---

[4] The two additional facts cited by the Plaintiff—her March 23, 2018 email to Moody and the FMLA certification form signed by the healthcare provider on March 28, 2018—when considered in context, are not evidence of shifting reasons for her termination. First, the Plaintiff sent the email to Moody in the early hours of March 23, 2018, and Moody forwarded the email to Murchek shortly thereafter. Beginning that same day, Moody was out of the office for a week, and Murchek unsuccessfully attempted to contact Castillo five times on March 28, 2018. Second, although the Plaintiff's doctor signed the certification on March 28, 2018, the Plaintiff identifies no evidence that the form was submitted to Sedgwick or the Defendant. Rather, the evidence shows that, on April 23, 2018, Sedgwick contacted the Plaintiff because it had not received the necessary additional information for her FMLA certification.

*Pagel v. TIN, Inc.*, 695 F.3d 622, 631 (7th Cir. 2012)). Unlike an interference claim, an FMLA

retaliation claim "requires proof of discriminatory or retaliatory intent." *Goelzer v. Sheboygan*

*County*, 604 F.3d 987, 995 (7th Cir. 2010) (citation omitted). "To succeed on a retaliation claim,

the plaintiff does not need to prove that 'retaliation was the *only* reason for her termination; she

may establish an FMLA retaliation claim by 'showing that the protected conduct was a

substantial or motivating factor in the employer's decision.'" *Id.* at 995 (quoting *Lewis v. Sch.*

*Dist. #70*, 523 F.3d 730, 741–42 (7th Cir. 2008)). To determine whether the evidence supports a

causal connection between the Plaintiff's termination and her requests for and taking FMLA

leave, the Court "consider[s] the evidence as a whole and ask[s] whether a reasonably jury could

draw an inference of retaliation." *King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017)

(citing *Ortiz*, 834 F.3d at 764–66).

    The Defendant argues that the Plaintiff's FMLA retaliation claim fails because the

Plaintiff cannot prove the necessary causal link. As with the ADA claim, the Plaintiff has failed

to offer evidence to create a dispute of fact that any decisionmaker knew, at the time of the

decisions to suspend and terminate her employment, that the Plaintiff had requested or taken

FMLA leave. It is undisputed that, when Moody suspended the Plaintiff on March 19, 2018, and

when Moody recommended the termination of the Plaintiff's employment to Vice Presidents

Sister Aline and Murchek on March 21, 2018, Moody did not know that the Plaintiff had

requested or taken medical leave. It is also undisputed that, when Sister Aline and Murchek

approved the termination on March 22, 2018, they did not know that the Plaintiff had requested

or taken medical leave. There is no evidence that Moody, Sister Aline, or Murchek were aware

of the March 14, 2018 email from David Fowlie, Leave Specialist for third-party administrator

Sedgwick. Nor is there any evidence to raise a dispute of fact as to their knowledge of the

Plaintiff requesting and/or taking leave. This alone defeats the element of causation, and the Plaintiff's FMLA retaliation claim fails.

Moreover, as set forth in the previous section, the evidence of record shows that the decision to terminate the Plaintiff's employment was because of her conduct and insubordination. To the extent the Plaintiff invokes the same pretext arguments she made in support of her ADA discrimination claim, the arguments fail for the same reasons set forth above. However, the Plaintiff raises a new pretext argument that suspicious timing supports her FMLA retaliation claim. Although suspicious timing is rarely enough, presentation of suspicious timing and pretext may defeat summary judgment. *Riley v. City of Kokomo*, 909 F.3d 182, 188–89 (7th Cir. 2018) (citation omitted). Here, the Plaintiff lists the following facts to suggest suspicious timing: she requested FMLA leave on February 2, 2018, and March 13, 2018; Fowlie from Sedgwick sent his email on March 14, 2018; Moody suspended the Plaintiff on March 19, 2018; the Plaintiff sent Moody an email on March 23, 2018, informing her that she was caring for her mother who had fallen; the Plaintiff's doctor completed the Certification of Health Care Provider form on March 28, 2018; and the Defendant terminated the Plaintiff's employment for abandonment on March 30, 2018.

The Plaintiff's recitation of the events omits key facts, and the full set of facts does not create an inference of pretext. First, there is no evidence that Moody, Sister Aline, or Murchek knew of Fowlie's March 14, 2018 email. The Plaintiff's conduct on March 18, 2018, led to Moody's investigation and was the stated basis for Moody suspending the Plaintiff on March 19, 2018. On March 20, 2018, after further investigation, Moody recommended to Sister Aline and Murchek that the Plaintiff's employment be terminated, and, on March 22, 2018, Sister Aline and Murchek approved the decision. That same day, Moody attempted numerous times by phone and email, without success, to contact the Plaintiff to inform her of the decision. The Plaintiff

18

returned Moody's email on March 23, 2018, at 1:40 a.m., and Moody forwarded the email to Murchek at 4:39 a.m.; Moody was then away from work for a week beginning that day. On March 28, 2018, Murchek attempted unsuccessfully to contact the Plaintiff five times to inform her of the decision.

Although the Plaintiff's doctor signed the Certification of Health Care Provider form on March 28, 2018, there is no evidence that the form was submitted to Sedgwick or the Defendant. Notably, on April 23, 2018, Sedgwick contacted the Plaintiff because it had not received the necessary additional information for her FMLA certification. The Plaintiff reasons that there would have been no reason for her doctor to sign the certification on March 28, 2018, if she had abandoned her job. However, the question is not whether the Plaintiff in fact abandoned her job, but rather what the Defendant knew and believed at the time the decisions were made. Because the Defendant had no communication from the Plaintiff, the determination was made on March 30, 2018, that the Plaintiff had abandoned her job. In any event, the decision to terminate her employment was made on March 22, 2018.

Accordingly, the Court grants summary judgment in favor of the Defendant on the Plaintiff's FMLA retaliation claim in Count IV.

## C.   FMLA Interference

Count III of the Complaint alleges that the Defendant unlawfully interfered with the exercise of the Plaintiff's rights under the FMLA. The FMLA makes it unlawful for an "employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" an employee's rights under the FMLA. 29 U.S.C. § 2615(a)(1). This includes a prohibition against "employers [using] the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." 29 C.F.R. § 825.220(c). The regulations delineate specific eligibility notice requirements to be followed when an "employee requests FMLA, leave

or when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason." *Id.* § 825.300(b)(1); *see also id.* § 825.300(c)(1), (d). An employer's failure to follow the notice requirements "may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights." *Id.* § 825.300(e). To prevail on an FMLA interference claim, a plaintiff must prove: "(1) she was eligible for the FMLA's protections, (2) her employer was covered by the FMLA, (3) she was entitled to leave under the FMLA, (4) she provided sufficient notice of her intent to take leave, and (5) her employer denied her FMLA benefits to which she was entitled." *Guzman v. Brown County*, 884 F.3d 633, 638 (7th Cir. 2018) (citing *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006)).

The Defendants argue that the Plaintiff cannot maintain an interference claim because she was not denied any FMLA leave to which she was entitled. In response, the Plaintiff bases this interference claim solely on her March 23, 2018 email to Moody, which was sent in response to Moody's numerous attempts to contact her the previous day to inform her that her employment was terminated. In her March 23, 2018 email, the Plaintiff explained that she had been preoccupied with her mother, who had fallen and broken her hip, and that she would like to speak to Moody. The Plaintiff argues that her email provided the Defendant with knowledge that the Plaintiff may need FMLA leave to care for her mother and that the Defendant failed to give the Plaintiff the requisite notice or even to respond to the Plaintiff's email. She argues that the Defendant instead terminated her employment seven days later on March 30, 2018. Again, the Defendant's decision to terminate the Plaintiff's employment had already been made on March 22, 2018, before the Plaintiff emailed Moody. Thus, because that decision had already been made, there could be no subsequent FMLA leave with which the Defendant could interfere.

Accordingly, the Court grants summary judgment in favor of the Defendant on the Plaintiff's FMLA interference claim in Count III.

**CONCLUSION**

For the reasons set forth above, the Court hereby DENIES as moot the Defendant's

Motion to Strike [ECF No. 35] and GRANTS the Defendant's Motion for Summary Judgment

[ECF No. 27]. The Court DIRECTS the Clerk of Court to enter judgment in favor of the

Defendant Franciscan Alliance, Inc. and against the Plaintiff Lucyna Castillo.

SO ORDERED on October 19, 2022.

 s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT